DAVIDOFF HUTCHER & CITRON LLP
*Proposed Attorneys for the Debtor*
120 Bloomingdale Road, Suite 100
White Plains, New York 10605
(914) 381-7400
Robert L. Rattet, Esq.
Jonathan S. Pasternak, Esq.

*Hearing Date: August 6, 2021*
*Hearing Time: 10:00 a.m.*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------X

In re:

FIFTEEN TWENTY SIX FIFTY SECOND LLC,

Chapter 11
Case No. 21-22397(RDD)

                                        Debtor.
---------------------------------------------------------------X

**DEBTOR'S OBJECTION TO THE MOTION OF 1526 52nd LLC**
**FOR  DISMISSAL OF THE CHAPTER 11 CASE AND FOR**
**SANCTIONS**

   **TO:    HONORABLE ROBERT D. DRAIN,**
          **UNITED STATES BANKRUPTCY**
          **JUDGE:**

        Debtor FIFTEEN TWENTY SIX FIFTY SECOND LLC  ("Debtor"),  by  its proposed

attorneys, Davidoff Hutcher & Citron LLP, hereby submits this objection and opposition (the

"Objection")  to  the  Motion  of 1526 52nd LLC ("Movant"), which  seeks (i) dismissal of the

Debtor's Chapter 11 case, and (ii) sanctions against the Debtor and related individuals (the

"Motion").  In  support  of this Objection,  the  Debtor  respectfully represents as follows:

1.      The Debtor filed this Chapter 11 case in a good faith effort to preserve, for its member and his family, its equity ownership interests in valuable real property located at 1526 52nd  Street, Brooklyn, New York (the "Property"). This is not a typical single asset real estate case where the Debtor holds no equity or a mere sliver of equity over a first mortgage; rather, the Debtor is the fee owner of a very valuable asset in the Property and is currently engaged in a conflict with unlawful occupants who are related to Movant and who are usurping occupancy under the guise of a month-to-month oral tenancy.

2.      Moreover, the entire history leading up to the Chapter 11 case is in material and bona fide dispute, including Movant's very standing and authority to bring the Motion, which the Debtor materially disputes.

3.      More than three years ago, Movant, a limited liability company organized under the laws of New York, was dissolved by a majority of its members,[1] and it remains dissolved to this day. Nonetheless, Movant presupposes its authority to bring the Motion or otherwise appear for or bind Movant, yet fails to advance a shred of proof or credible explanation capable of supporting such authority. This failure alone disqualifies Movant from seeking or entitlement to any of the relief it seeks through the Motion.

4.      In addition to Movant's defective standing and lack of capacity to bring the Motion, numerous other material facts at issue in this Chapter 11 case are subject to bona fide dispute. Specifically, unresolved material questions of fact concerning the make-up of ownership interests in Movant, along with the related parties' claimed entitlement to occupancy of the Property, are in bona fide dispute. Moreover, Movant's incredible allegations concerning the

---

[1] Movant recently tried to ex parte reinstate the LLC in State Court *without notice to Bluma or Tova*, the other two majority members, resulting in a denial of Movant's petition to reinstate. Bluma has recently moved to intervene to deny the reinstatement with prejudice.

alleged sale of the Property comprise a series of deceptions, untruths, and unauthorized conduct by Movant and certain of its principals and insiders culminating in an implausible and fabricated sale closing lacking any indicia of a traditional real estate transaction.

5.      As set forth in greater detail below, the Motion is replete with inaccuracies, half-truths, self-serving statements and unsubstantiated, if not incomprehensible, "facts" and "evidence" which pose more questions than they answer.

6.      As a result, assuming arguendo that Movant can somehow establish legal standing and authority to bring the Motion, the Court must conduct, at a minimum, an evidentiary hearing and permit related discovery so that the Debtor can have a full and fair opportunity to be heard on its version of the facts.

7.      Moreover, the Bankruptcy was indeed filed in good faith.

8.      The actions of Movant's principals have resulted in, to wit, the failure to make no less than ten (10) monthly mortgage payments on the Property in the past year and pay real estate taxes – requirements for its disputed possession and as more recently required by the State Court, for which Movant and its related parties are currently in contempt. As a direct result, the mortgage on the Property is in default and the Debtor and its beneficiaries are in jeopardy of losing the Property in foreclosure.

9.      Movant would instead prefer to go back to state court where the dispute will continue to languish for years, with the Property likely to be lost in foreclosure along the way.

10.     The Bankruptcy was therefore filed to preserve the Property and permit, inter alia, a Court-authorized sales process which will maximize the value of the Property for all interested parties.

11.     Thus, Movant's apparent displeasure with the Debtor's business decision to seek bankruptcy relief and to terminate Besamche (as defined below) and/or Sender a/k/a Alexander Ashkenazi and Rivka Ashkenazi from continuing to live cost-free in a six-story luxury townhouse does not – nor could it – amount to a bad faith filing and is decidedly not sanctionable.

12.     As a result of such deceptive and unauthorized actions, Debtor and its predecessor in interest, who acquired and developed the Property almost 20 years ago, have been forced to take actions to reclaim their legitimate interests in the Property.

13.     Fortunately, there is significant equity in the Property which can be realized through a competitive sale and subsequent plan process.

14.      The Debtor is therefore capable of reorganization and should be permitted a short but reasonable amount of time to reorganize.

### **BACKGROUND**

15.     The history of the relationship between the Debtor, the Movant, and the Ashkenazis is contained in the Debtor's 1007-4 Declaration previously filed with this Court and specifically incorporated herein by reference.

16.     On July 7, 2021 (the "Filing Date"), the Debtor filed a voluntary petition for reorganization pursuant to Chapter 11 of the Bankruptcy Code. The Debtor has continued in possession of its Property and the management of its business affairs as a debtor-in-possession pursuant to §§1107 and 1108 of the Bankruptcy Code.

17.     No Official Committee of Unsecured Creditors has been appointed. No trustee or examiner has been appointed.

18.    In June 2001, Bluma Lefkowitz ("Bluma"), spouse of the Debtor's sole member and CEO, Isaac Lefkowitz ("Isaac"), acquired title to a multi-family residential property located at 1526 52nd Street, Brooklyn, New York 11219 (the "Property").

19.    The Property comprises a six-story, two family building in Brooklyn, New York. Constructed in 2001, the Property was further renovated in 2014 by Bluma and Isaac. It is zoned for residential use.

20.    In October 2006, Bluma transferred 50% of her undivided interest in the property to Tova Greenbaum ("Tova") pursuant to a duly recorded deed with the City of New York.

21.    From 2006 to 2014, the deed to the Property remained titled in Bluma and Tova as tenants in common.

22.    In 2014, Isaac owned and operated a company called Vetcare Health, Inc. ("Vetcare"). In March 2014, Vetcare and Isaac negotiated yet another in a series of business loans for Vetcare with a long time business associate of Isaac's named Sender a/k/a Alexander Ashkenazi ("Sender"), wherein Sender agreed this particular time to lend Vetcare $1,000,000.00, after having lent other monies to Vetcare in the past, for which he received full repayment each time.

23.    Loan documents were prepared and executed between Vetcare and Sender. *See* **Exhibit "A"** annexed hereto. As further consideration for making the loan, the parties agreed that the Property would serve as "unofficial" additional collateral for repayment of the $1,000,000.00 loan. To that end, a contract of sale and deed for the Property were drafted so as to be held in escrow. The deed for the Property would be released from escrow, finalized, notarized, and delivered to Sender *only* in the event that Vetcare defaulted upon the loan.

24.     The unofficial contract of sale provided for a "purchase price" of $2,025,000,[2] which entailed the submission of a down payment in the amount of $560,000.00. The contract of sale and deed were delivered to Sender to be held in escrow by his attorney, Norman Seidenfeld ("Seidenfeld") pending default or repayment of the loan, in which case (repayment) the contract of sale and deed would be returned to Bluma.

25.     In the meantime, Isaac/Vetcare and Sender continued engaging in other business relationships, whereby, inter alia, Sender would loan other monies to Isaac/Vetcare and which monies were routinely repaid by Isaac/Vetcare in full.

26.     At this time, Sender also requested that Bluma permit his supposed charitable entity, Mesamche Lev-Viyoel Moishe Inc. ("Mesamche"),[3] to occupy portions of the Property on a month-to-month basis. No license, lease, or other written instrument was ever executed. However, Sender, a purported director of Mesamche, agreed that he and Mesamche would cover the maintenance of the Property, including the debt service on the outstanding mortgage on the Property currently held by Arvest Central Mortgage Company ("Arvest") in the approximate current outstanding amount of $1,250,000.

27.     Only after permitting this entity to occupy the Property did Bluma learn that the so-called charitable entity, Mesamche, was a sham corporation that was merely a conduit for and alter ego of Sender.

---

[2] Movant refers to a "Rider" to the Contract of Sale for the personal contents of the Property for $2,000,000. Debtor is unaware of the existence of any executed Rider to that effect and believes it was unilaterally prepared after the fact by Movant related parties and/or their counsel.

[3] The Court should note that Mesamche has no known corporate existence in New York and has not registered either a corporation name or authority to do business. The beneficiaries of its charitable largesse are unknown.

28.     During the entire term of the Vetcare loan, among other loans between Isaac and

Sender, Vetcare and Isaac remained current on all payments and obligations under its loan

agreements with Sender.

29.     On July 9, 2014, USA Corp. Inc., a corporate service company, formed an entity

known as 1526 52nd LLC, the herein Movant. Movant's incorporation documents indicate that

Bluma was designated as agent for service of process, using her home address for such process.

See **Exhibit "B"** annexed hereto.

30.     Upon information and belief, the members of Movant were to be Bluma, Tova,

and Rivka Ashkenazi ("Rivka"), the wife of Sender. Sender and Rivka are hereinafter referred to

as the "Ashkenazi Parties."

31.     Upon learning of the formation of Movant, Bluma and Tova, as majority

members, voted to dissolve Movant.

32.     Bluma subsequently discovered that, unbeknownst to either herself or Tova, on

July 28, 2014, the deed for the Property, which was supposedly held in escrow by Seidenfeld,

was released to Sender, which deed was completed and notarized by Seidenfeld, despite the fact

that neither Bluma nor Tova ever met or appeared before Seidenfeld to have their signatures

notarized. In fact, nor could they, as July 28, 2014 was a day of observance for religious Jews

such as Bluma and Tova that prohibited them from executing such an instrument on that date.

33.     It was then discovered that Rivka thereafter caused the fraudulent deed ostensibly

conveying the Property from Bluma and Tova to Movant to be recorded by the City of New

York on August 1, 2014, despite the fact that (1) the Sender loans were never in default, (2) the

majority members of Movant had already voted to dissolve Movant and have the deed and

contract returned, (3) Movant paid no consideration for transfer – either under the purported

contract of sale or otherwise, and (4) no other indicia of a formal sale existed. Specifically, (a)
Bluma and Tova, the purported "sellers," were not represented by counsel on the purported sale,
which would otherwise have violated New York law, (b) the Debtor disputes the existence of a
purported "rider" to the "contract of sale" for *furniture and personalties* conveniently for the
substantial sum of $2,000,000, almost the exact balance of the consideration allegedly paid in
connection with "sale", (c) the absence of any down payment ever having been delivered to the
purported "sellers," (d) the fact that no closing ever occurred, (e) the failure of any abstract
company or title closer to attend or otherwise participate in the transaction, and (f) the lack of
any consent – written or otherwise – by the mortgagee having been obtained to assume the
underlying mortgage (a material consideration under the "contract of sale"). *See* various
affirmations of the Lefkowitz's and their counsel filed in the State Court Action annexed hereto
as **Exhibit "C"**.

34.    Attached to the Motion as Exhibit "B"  are various self-serving emails sent by
Sender to Isaac allegedly referencing the "sale" of the Property to Movant, along with a list of
nondescript, unexplained, and incomprehensible alleged payments that are randomly assembled
for the ostensible purpose of evidencing Movant's payment of the "purchase price" for the
Property. The description, source, and subject matter of the payments is entirely unclear. The
only notable facts that can be reasonably ascertained from the exhibit are that (a) only one
payment for $8,000 is made payable to Bluma, a 50% "seller", (b) not one payment was payable
to Tova, the other 50% "seller," and (c) there exists no written instructions of disbursement by
either Bluma or Tova, the purported "sellers." The list of the checks is even less descriptive,
identifying two series of sequential check numbers, from 4390 to 4397, then two out-of-sequence
check numbers, from 2481-2486, with no identification of the payor, payee, or purpose.

35.     Of course, Sender and Isaac had a history of financial dealings, which included numerous transactions, including loans, and payments made thereon over the course of their relationship. At least some of the listed checks appear to reflect payment on prior loans, all of which have since been repaid in full.

36.     Notwithstanding these facts, Rivka, without any firsthand knowledge thereof, has alleged under oath that the first $560,000 loan installment made to Vetcare was actually the down payment under the alleged "contract of sale". In actuality, the $560,000 represented the first loan advance under the $1 million Vetcare loan facility. Rivka's sworn statements were made in the action commenced in Kings County Supreme Court captioned *1526 52nd LLC v. Bluma Lefkowitz,* Index No. 515379/2018 (the "State Court Action").

37.     In fact, no consideration was ever given by Movant or any other parties on its behalf for Movant's improper and unauthorized recordation of the deed for the Property.

38.     As for the Vetcare loans, they were all timely paid back in full. Sender even executed a Loan Repayment Acknowledgement, which is part of the record in the State Court Action, but that Movant – quite tellingly – failed to include in its herein Motion. A copy of the Loan Repayment Acknowledgement is annexed hereto as **Exhibit "D"**.

39.     On June 26, 2018, following their discovery of Sender's (and his attorney's) misconduct in connection with the fraudulent ex parte completion, notarization, and recordation of the deed, Bluma and Tova, acting as majority members of Movant, executed a deed transferring ownership of the Property from Movant back to Bluma. The deed was recorded on July 11, 2018.

40.     Thereafter, a corrected deed effecting the same transfer was recorded on behalf of Bluma on August 29, 2018.

9

41.    On July 31, 2018, Movant was dissolved pursuant to the vote of the majority

members referred to above.

42.    Four days prior to its dissolution, Movant commenced the State Court Action,

which was pending before the Kings County Supreme Court as of the Petition Date.

43.    In the State Court Action, Movant sought to quiet title to the Property and declare

the deed transferring the Property back to Bluma as void, arguing that the "purchase price" under

the mere placeholder contract of sale was paid in full. The $560,000 loan to Vetcare made by

Sender, Movant argues, was actually a down payment on its purchase of the Property. Movant

further argues that Rivka (a) assumed the existing first mortgage on the Property, and (b) paid

Bluma the balance of the $2,025,000 so called purchase price – none of which turned out to be

true. As set forth above, the $560,000 was in fact a loan to Vetcare which was repaid in full and

on time by 2015. No assumption of mortgage documentation exists – nor could it exist –without

the express written consent of the mortgagor and Bluma. And no other sale proceeds were ever

paid to Bluma or any other party.

44.    Movant also filed a lis pendens against the Property in connection with the State

Court Action.

45.    Subsequent to the commencement of the State Court Action, Bluma brought a

holdover proceeding in the Civil Court of the City of New York, County of Kings, captioned

*Bluma Lefkowitz v. Rivka Ashkenazi and Alexander Ashkenazi*, Index No. 87732-LT-2018 (the

"Holdover Proceeding") naming as respondents the Ashkenazi Parties and any other occupants of

the Property. The Ashkenazi Parties were served with a proper 30 days' notice to quit based

upon, among other things, (a) their failures to honor the month to month arrangement described

above, which failures continued for over 4 years, (b) denying Bluma access to the Property, (c)

allowing the mortgage to fall into default, and (d) leaving the Property subject to their disputed, naked possessory interest.

46.     Unfortunately, the State Court stayed the Holdover Proceeding pending further adjudication of the State Court Action and has denied all dispositive motions in both cases, leaving the parties subject to protracted discovery, delay, substantial fees and costs, and uncertainty. Furthermore, Bluma the Debtor continue to be denied access to the Property or any rental income that they require to pay, inter alia, their mortgage obligations.

47.     On reargument, the State Court issued an order dated April 10, 2019 and entered April 16, 2019 (the "Payment Order") directing the Ashkenazi Parties to make rental payments for their use OF the Property or mortgage payments servicing the mortgage on the Property. A copy of the Payment Order is annexed hereto as **Exhibit "E."**

48.     The Ashkenazi Parties are now in contempt of the Payment Order based upon their failure to make any such payments for more than 10 months.

49.     As a result of their unlawful possession, and the Ashkenazi Parties' failure to comply with the Payment Order issued by the State Court, the Debtor has no ability to generate income or, inter alia, service the existing mortgage of approximately $1,250,000, which mortgage is now in default. Further, the Debtor has no ability to market the Property without immediate and unfettered access to the Property.

50.     In order to mitigate any further loss or diminution in value, the Debtor, in its business judgment, has determined that the best and most efficient way to repay its legitimate creditors and preserve the equity for its member and his children beneficiaries, as always intended, is through a sale of the Property through a concerted and Bankruptcy Court authorized sale process.

51.     The Property was always intended to be a legacy for the children of Bluma and

Isaac. As part of their estate planning, on June 30, 2021, Bluma transferred her interest in the

Property to the Debtor by quit claim deed.

52.     Meanwhile, due in part to the Ashkenazi Parties' continued holdover possession

and bad faith litigation tactics, the Property is not generating any income and could not be sold or

refinanced outside of bankruptcy absent disposition of the pending litigation.

53.     The Debtor therefore filed the Chapter 11 case in good faith to either quickly

resolve or have this Court efficiently adjudicate this long standing dispute with the Ashkenazi

Parties, gain immediate access to the Property,[4] market and sell the Property through a Chapter

11 plan, and pay all legitimate creditors in full. The Debtor hopes to preserve the significant

equity in the Property for the Lefkowitz's children after payment of all legitimate claims and

interests in the Property from the proceeds of sale to be realized and conducted though a

thorough and Court-approved marketing and auction sale process designed to maximize the

value of the Property, which has an approximate fair market value of $4,000,000.

54.     The Debtor will, simultaneously with the sale and marketing process, attempt to

promptly resolve or adjudicate any claims or interests asserted by the Ashkenazi Parties.[5]

55.     The Debtor therefore submits that the filing of the Chapter 11 case was necessary

to preserve the value of the estate and maximize a return to its legitimate creditors.

56.     The Property requires marketing in order to maximize its value upon sale.

---

[4] The Debtor has heretofore filed a motion seeking access to the Property pursuant to Bankruptcy Rule 2004 or, in the alternative, FRCP Rule 34. The Debtor's insurance carrier has now also demanded access to the Property for insurance purposes and has threatened to cancel the Debtor's insurance if it is not permitted immediate access.

[5] To expedite this long standing and stalled dispute in the State Court, Debtor attempted to remove the State Court Action at the commencement of the Chapter 11 Case. The District Court has stayed the removal pending this Court's consideration of the Motion. The Debtor still believes that the Bankruptcy Court is the most effective and expeditious venue to resolve the underlying dispute between the parties.

57.     To that end, the Debtor has recently engaged Rosewood Realty ("Broker") as exclusive real estate brokers for the sale contemplated herein. Broker and its principals have extensive experience representing sellers and Debtor in this Court while achieving successful results for numerous bankrupt estates.

58.     The Debtor has heretofore filed an application to employ the Broker as real estate consultant and broker to market and sell the Property pursuant to a competitive bidding process and subsequent auction, if necessary

59.     The Debtor has also heretofore filed a motion for approval of bidding procedures in connection with the sale and marketing process.

60.     Upon the sale of the Property, the Debtor will file a plan that maximizes a potential return to creditors, the equity interest holder and his beneficiaries alike.

## ARGUMENT

### A.  The Motion to Dismiss Must be Denied

61.     The Motion to Dismiss must first be denied since Movant has failed to establish standing or authority to bring the Motion.

62.     The Debtor wholly disputes such authority for the reason set forth above. Such dispute is consistent with the positions taken in the underlying dissolution of Movant and the State Court Action.

63.     Movant has failed to offer any evidence or proof that it has the authority to act on behalf of or bind Movant, assuming Movant has the legal ability, as a dissolved entity, to bring the instant Motion in the first place.

64.     Second, the Motion is replete inaccurate, untrue and misleading facts, all of which are subject to material dispute. Assuming arguendo Movant can establish standing/authority, the

Court should hold an evidentiary hearing and compel immediate discovery of Movant and the
Ashkenazi Parties prior to considering the Motion.

65.    Third, the Debtor filed for Chapter 11 relief as a necessity to preserve and protect
the Property with the good faith intention to use the Bankruptcy Court as a legitimate forum to
reorganize its affairs by preserving the Debtor's equity interests in the Property through a fair
market approach to the sale of the Property in order to benefit all legitimate stakeholders and
claimants of the Debtor.

66.    A motion seeking to dismiss a chapter 11 proceeding is determined under
§1112(b) of Title 11 of the United States Code (the "Bankruptcy Code"), which states in
pertinent part,

> (b) (1) Except as provided in paragraph (2) and subsection (c), on request
> of a party in interest, and after notice and a hearing, the court shall convert
> a case under this chapter to a case under chapter 7 [11 USCS §§ 701 et seq.]
> or dismiss a case under this chapter [11 USCS §§ 1101 et seq.], whichever
> is in the best interests of creditors and the estate, for cause unless the court
> determines that the appointment under section 1104(a) [11 USCS § 1104(a)]
> of a trustee or an examiner is in the best interests of creditors and the estate.
> 11 U.S.C. §1112.

67.    Bankruptcy Code §1112(b)(4) sets forth a nonexhaustive list of "cause"
supporting dismissal of a case. Absent from the §1112(b)(4) is "bad faith." There is no specific
statutory language stating that a case may be dismissed for bad faith. Notwithstanding the lack of
explicit statutory guidance, case law dictates that the determination of a motion to dismiss for
bad faith requires both a subjective and an objective showing of bad faith, as set forth in *Carolin
Corp v. Miller*, 886 F.2d 693 (4th Cir. 1989) and adopted in the Second Circuit in *In re General
Growth Properties Inc.*, 409 B.R. 43 (Bankr. S.D.N.Y. 2009).

14

68.     The dual standard set forth in *Carolin* requires a movant to establish both that the debtor had improper motive in filing and the case evidences objective futility with respect to a debtor's ability to successfully reorganize. As stated in *Carolin*:

> "[A] bankruptcy court may dismiss such a petition for want of good faith in its filing, but only with great caution and upon supportable findings both of the objective futility of any possible reorganization and the subjective bad faith of the petitioner in invoking this form of bankruptcy protection."

*Carolin Corp. v. Miller*, 886 F.2d 693, 694 (4th Cir. 1989)

69.     The Court in *Carolin* continued:

> [I]f the only question raised is whether a reorganization is realistically possible, *i.e.,* if there is no questioned the petitioner's subjective good  faith in filing, threshold dismissal of a petition is not warranted. In those circumstances the question of ultimate futility is better left to post-petition developments…it is better to risk proceeding with a wrongly motivated invocation of chapter11 protections whose futility is not immediately manifest that to risk cutting off even a remote chance that a reorganization effort so motivated might nevertheless yield a successful rehabilitation.

*Id.* at 700-01.

70.     In evaluating the indicia of bad faith, the Court in *Carolin* required examining the totality of circumstances, with no single factor necessarily leading to a finding of bad faith. *Id.* at 701. The Court further found no intrinsic bad faith in the filing of the chapter 11 petition in the eleventh-hour, stating:

> These final hour events would not, standing alone, warrant an inference of bad faith -- though they might support in a critical way otherwise justifiable suspicions. By providing for interim emergency relief, including an automatic stay of creditor self-help efforts, the bankruptcy code manifestly sanctions -- indeed encourages -- not only the eleventh- hour invocation of its protection, but the last minute appearance of new management armed with fresh capital… In such circumstances, a last ditch attempt to forestall imminent financial collapse would obviously *further* the purposes of Chapter 11 if it ultimately facilitated the emergence of new investors offering an "infusion of capital" and previously unavailable "management expertise."

*Id.* at 703-04. (emphasis in original)

71.     The 4th Circuit Court in *Carolin* ultimately affirmed the bankruptcy court's dismissal of the chapter 11 case finding evidence of both objective and subjective bad faith. In *Carolin*, the Debtor was a real state holding company that owned an industrial building, which was leased to an affiliate entity. Subsequent to taking possession, the building was damaged by a fire. The insurance proceeds were up streamed to the owners of the debtor and the repairs to the building were not completed. The affiliate tenant had ceased paying any rent, and the debtor had made no efforts to secure financing. The unwillingness of that debtor to reorganize its affairs by finding a new tenant, undertake the required repairs, and provide funding or adequate protection all established cause for dismissal of the case. As set forth above, none of those facts are present in the Debtor's Chapter 11 case and quite to the contrary.

72.     Movant's citation to *In re C-TC 9th Ave. P'ship v. Norton (In re C-TC 9th Ave. P'ship)*, 113 F.3d 1304, 1310 (2d Cir. 1997); *In re SGL Carbon Corp.*, 200 F.3d 154, 160-61 (3d Cir. 1999); *In re Schur Mgmt. Co.*, 323 B.R. 123, 126 (Bankr. S.D.N.Y. 2005) and *In re HBA East, Inc.*, 87 B.R. 248, 258 (Bankr. E.D.N.Y. 1988) in purported support of its position that this case as a "two-party dispute which can be resolved in a non-bankruptcy forum" is unavailing and misplaced. By, among other things, refusing to abide by the Payment Order and denying Bluma access to the Property, Movant's related parties have placed the mortgage on the Property in default, which threatens to destroy Bluma's credit rating and force her to file bankruptcy personally to avoid total devastation of her assets. This Chapter 11 case, therefore, is hardly a mere two-party dispute. On the contrary, as set forth above, its filing was in furtherance of legitimate and well-founded purposes.

73.     It is axiomatic that "the concept of bad faith filing should be used sparingly to avoid denying bankruptcy relief to statutorily eligible debtors except in extraordinary circumstances. *In re 234-6 W. 22nd St. Corp.*, 214 B.R. 751, 757 (Bankr. S.D.N.Y. 1997)

74.     Courts have upheld numerous Chapter 11 filings against "bad faith" dismissals on the basis of eve-of-bankruptcy transfers of property into a newly formed entity. *See, e.g, In re 68 W. 127 St., LLC*, 285 B.R. 838, 846 (Bankr. S.D.N.Y. 2002) (Drain, J.) (holding that "[s]imilar observations may be made about other commonly listed bad faith factors"); *In re Levinsky,* 23 B.R. 210, 218–219 (Bankr. E.D.N.Y. 1982) (determining that the debtor's filing was not in bad faith notwithstanding an eve-of-bankruptcy transfer of property to newly formed entity with minimal unsecured debt, because transfer did not impair any substantive or procedural right of the complaining creditor); *In re Levinsky, Id.*, at 218  (holding that the test of whether pre-filing transfers of property in aid of reorganization should be upheld "seems to be whether any of the substantive or procedural rights of any of the creditors to assets, available prior to the transfer of the property, have been altered or eroded by the transfer and subsequent Chapter 11 filing. . . . Utilizing this test in the present case, I find that no substantive or procedural right of the Bank was in any way adversely affected by the transfer of the Levinskys' title in the property at 1122 Ocean Avenue to their partnership."). Similarly in the Debtor's Chapter 11 case, the creation of the Debtor and the transfer of the Property to it from Bluma in no way further affects and substantive or procedural rights of Movant.

75.     In *In re MBM Ent., LLC*, in refusing to dismiss a similar Chapter 11 case where the primary impetus for filing was the existence of a two-party dispute, the Court stated that "a bankruptcy petition should be dismissed for lack of good faith only sparingly and with great

caution." 531 B.R. 363, 408 (Bankr. S.D.N.Y. 2015) (citing *General Growth,* 409 B.R. at 56.

The *MBM Ent.* court further stated:

> Therefore, a determination of any, or several, of these factors may not serve
> to establish bad faith; for example, a finding that a bankruptcy petition was
> filed with the intent to frustrate creditors may not be adequate to evidence
> the "absence of intent to seek rehabilitation" because affording a debtor
> "breathing room" from creditors is a major goal of the bankruptcy laws, and
> it is expected that creditors will be delayed and "frustrated" when the debtor
> files a petition.

*Id.*, 531 B.R. at 408 (Bankr. S.D.N.Y. 2015)

76.    In  *Baker v. Latham Sparrowbush Assoc. (In re Cohoes Indus. Terminal, Inc.),*

931 F.2d 222, 227-28 (2d Cir. 1991) the Second Circuit similarly denied dismissal of a Chapter

11 case and reversed a significant award of sanctions, holding that collateral attack on a state

court judgment was an appropriate use of bankruptcy where there exists a reasonable possibility

of reorganization. In *Cohoes,* the court stated:

> A petition for Chapter 11 bankruptcy may be deemed frivolous if it is clear
> that on the filing date there was no reasonable likelihood that the debtor
> intended to reorganize and no reasonable probability that it would
> eventually emerge from bankruptcy proceedings.

931 F.2d at 227.

77.    This case represents an unusual situation where the Chapter 11 case has been

caused by Movant's *own* actions. Movant's brazen action of defying the Payment Order

represents the primary cause of the Debtor's bankruptcy filing. The Debtor respectfully submits

that this Court should, in fact, find that there exists a "bad faith" actor in this proceeding; the

identity of that actor, however, is unmistakably not who Movant says it is. Indeed, Debtor,

through its undersigned counsel, offered to arrange for consensual access to the Property

pursuant to Fed.R.Civ.P. Rule 34(a)(2) as incorporated by Fed.R.Bankr.P. Rules 7034 and 9014

in an effort to avoid motion practice. Movant, in response thereto, summarily rejected Debtor's proposal without explanation or any counterproposal and instead filed the instant Motion.

78.     Thus, this case differs significantly from *In re Laguna Assocs. Ltd. P'ship.*, 30 F.3d 734, 738 (6th Cir. 1994), as amended on denial of reh'g and reh'g en banc (Sept. 9, 1994), and *In re St. Stephen's 350 E. 116th St.*, 313 B.R. 161, 171 (Bankr. S.D.N.Y. 2004), wherein the primary creditor was a foreclosing mortgagee and the property in question was transferred by the non-paying prior owner to the debtor. In this case, Movant has no legal interest in the Property other than that of a squatter, and the Debtor and its predecessor in interest are being prejudiced daily by Movant's brazen failures to obey the Payment Order. It is the Debtor and its beneficiaries who continue to be harmed by Movant's actions, fully legitimizing the need for Chapter 11 relief.

79.     The Court should therefore permit the Debtor's efforts to sell the Property under 11 U.S.C. §363 and to proceed to reorganization.

**B.  Movant's Request for Sanctions Is Abjectly Devoid of Merit**

80.     Movant's request for sanctions is improper and overreaching.

81.     The Debtor, not a serial filer, legitimately sought, on behalf of its beneficiaries, bankruptcy relief to preserve its interests in the equity of the Property, which equity continues to erode due to Movant's continued contempt and bad faith conduct.

82.     In order to preserve the Debtor's interest in the equity in the Property, it legitimately availed its rights provided by the Bankruptcy Code to create a "level playing field," break the impasse at the State Court level, and permit this Debtor a reasonable opportunity to reorganize and preserve its only asset. In such context, the commencement of the Chapter 11 case cannot be considered sanctionable.

83.     Further, "courts have been reluctant to adopt a *per se* rule that the determination of a bad faith filing requires the imposition of sanctions." *In re Intercorp Int'l, Ltd.*, 309 B.R. 686, 692 (Bankr. S.D.N.Y. 2004) (citing *In re Marsch*, 36 F.3d 825, n.1 (9th Cir. 1994); *FDIC v. Fadili*, 165 B.R. at 60; *In re Collins*, 250 B.R. 645, 656 (Bankr. N.D. Ill. 2000); *In re McBride Estates, Ltd.*, 154 B.R. 339, 342 (Bankr. N.D. Fla. 1993); *In re Whitney Place Partners*, 123 B.R. 117, 121 (Bankr. N.D. Ga. 1991); *In re HBA East, Inc.*, 101 B.R. 411, 418 (Bankr. E.D.N.Y. 1989)).

84.     Rather, the burden for the imposition of sanctions is much more stringent. Evidence of sanctionable conduct must be "clear" or "substantial." *In re Intercorp Int'l, Ltd.,* 309 B.R. at 693. "A petition may be deemed frivolous if it is clear that on the filing date, there was no reasonable likelihood that the debtor intended to reorganize and no reasonable probability that it would eventually emerge from bankruptcy proceedings." *In re Cohoes,* 931 F. 2d, at 227; *see also, In re C-TC,* 113 F. 3d at 1310; *In re Intercorp*, 309 B.R. at 694.

85.     The debtor in *In re Cohoes Industrial Terminal, Inc.* filed chapter 11 for the purpose of reviving and relitigating a lease that terminated pre-petition. *See In re Cohoes Industrial Terminal, Inc.,* 931 F.2d 222 (2d Cir. 1991). The debtor in *Intercorp* not only had the property transferred to the debtor on the eve of filing, after a full trial, in an effort to evade entry of a judgment, but also had no ability to reorganize. *See In re Intercorp Int'l, Ltd.*, 309 B.R. 686. In *Parikh,* the debtor had a long documented history of contempt and perpetrated a "planned, calculated scheme to defraud and delay [the creditor] from the collection of his judgment." *In re Parikh*, 508 B.R. 572, 581 (Bankr. E.D.N.Y. 2014).

86.     In the case at bar, the Debtor is acting in good faith by attempting to preserve its one valuable asset – its equity interest in the Property – against the oppressive and bad faith

actions of the Movant and the Ashkenazi Parties. The Debtor is not a "serial filer," far from it.

Moreover, Debtor's manager is acting quickly to try and sell the Property in an effort to avoid a

wipeout of the estate and a potential windfall to Movant, who has paid absolutely nothing for the

Property and has offered no legitimate proof of same.

87.    The Debtor should certainly not be sanctioned for making a good faith effort to

reorganize.

88.    Movant's motion for sanctions should therefore be denied in its entirety.

## CONCLUSION

89.    Movant has neither established standing nor authority to bring the Motion as

Movant was dissolved over three years ago, remains dissolved to this day and the Debtor further

disputes the authority by a minority member of Movant to bring the Motion *ab initio*.

90.    Moreover, the Motion is replete with inaccuracies, half-truths, and

misrepresentations. Discovery and an evidentiary hearing are required before the Court,

assuming Movant could establish standing/authority (which it cannot), can consider the Motion.

91.    Even if the Court were to consider the Motion, the Debtor filed the Chapter 11

case as a result of Movant-related parties' own bad faith and illegal conduct, with genuine and

sincere intentions to maximize and preserve the value of the Property for the benefit of all

creditors and equity interest holders alike. There indeed exists a likelihood of reorganization if

the Debtor is permitted to move forward with its motions for access and sale procedures,

respectively. Simply put, there is simply no indicia of bad faith filing.

92.    Accordingly, the Debtor respectfully requests that the Court (a) deny the Motion

in its entirety, (b) grant the Debtor's motion for access to and sale of the Property, and (c) grant

the Debtor such further relief this Court deems just and proper.

21-22397-rdd    Doc 24    Filed 07/30/21    Entered 07/30/21 12:18:05    Main Document
Pg 22 of 23

**WHEREFORE,** the Debtor respectfully requests that the Court deny the Motion and

request for sanctions in its entirety and grant the Debtor such other and further relief as is just

and proper under the circumstances.

Dated: White Plains, New York
July 30, 2021

DAVIDOFF HUTCHER & CITRON  LLP
*Proposed Attorneys for the Debtor*
120 Bloomingdale Road, Suite 100
White Plains, New York 10605
(914) 381-7400


By: */s/ Jonathan S. Pasternak*
Jonathan S. Pasternak

## DECLARATION

ISSAC LEFKOWITZ hereby affirms the following under penalties of perjury:

1.   I am the CEO of the Debtor and as such am fully familiar with the facts and

     circumstances surrounding the Debtor and the Chapter 11 case.

2.   I hereby declare that the facts set forth in the above Objection are true and correct,

     based upon my information and belief.

Dated: Suffern, New York
       July 30, 2021


                                    */s/ Isaac Lefkowitz*
                                    Isaac Lefkowitz